Case: 3:06-cv-00732-bbc   Document #: 45   Filed: 09/28/07   Page 1 of 20

Document Number Case Number
06-C-0732-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
09/28/2007 03:37:57 PM CDT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF TIERRA HILL and,
MINNIE MARIE HILL,

      Plaintiffs,

Case No.: 06 C 0732 C

v.

MARIE RICHARDS, et al.,

      Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

---

NOW COME THE PLAINTIFFS, The Estate of Tierra Hill and Minnie Marie Hill, by their attorneys Gingras, Cates & Luebke, S.C., by Robert J. Gingras and Paul A. Kinne, and hereby state the following as their Brief in Response to the Defendants' Motions for Summary Judgment in the above referenced matter.

I.    INTRODUCTION

    This is a case about a social worker deliberately ignoring clear signs of suicide risk. That deliberate indifference tragically led to a young woman's death by hanging. On May 17, 2004, Marie Richards, a social worker with Mental Health Center of Dane County (Mental Health Center), met with Tierra Hill in the Dane County Jail. The Mental health Center provided mental health services to inmates in the jail for Dane County.

    Tierra Hill had been in the Dane County Jail before. Richards had come to know Hill through those prior stays. In fact, Richards knew that Hill had been placed on suicide watch

during prior stays, and Hill had made suicidal comments directly to Richards in 2003. When Hill made these comments, Richards was careful to document that she had asked Hill if she planned to kill herself, and Richards documented that she had extracted promises from Hill not to kill or harm herself. In fact, Richards was trained to ask these questions and document them along with the answers.

On May 17, 2004, Hill had been in jail for about two days. Hill told her teach about a recent suicide attempt, and showed her teacher the wounds. The teacher immediately summoned Richards to meet with Tierra. During the course of the May 17 meeting, Hill told Richards that she had poked herself in the wrist with a thumbtack on May 15, in the hopes that she would hit a vein and kill herself. Richards documented Hill's description of the suicide attempt, but Richards did not document any questions that she asked Hill about Hill's then-present intent to harm herself.

At the May 17 meeting, Richards knew of more than Hill's self-described suicide attempt and her history of suicidality. Richards knew that Hill had been diagnosed with depression, and that a psychiatrist had prescribed medication to Hill for that depression. Richards knew that Hill had been off of her medication for nearly one month as of their May 17 meeting. And Richards knew that Hill was housed in the administrative confinement unit, where other inmates could not see her and where it was difficult for the guards to see her.

In the face of this information, Richards did nothing. She did not tell the guards about Hill's suicide comment, nor did she tell her colleagues about Hill's characterization of her act of self harm as a suicide attempt. Not only did Richards not act in the face of this obvious risk, she

evidently did not even think about it. No mental health worker, including Richards, saw Hill again after Richards' May 17 meeting with Hill.

On May 20, Hill hanged herself to death in her isolated cell. In spite of the case law and the facts described above, the defendants have moved for summary judgment, claiming that as a matter of law, Hill's estate cannot prove that Richards was deliberately indifferent to the suicide risk. Likewise, they move on the grounds that the plaintiffs have not proven negligence. For the reasons that follow, the motions for summary judgment should be denied.

II.     STATEMENT OF FACTS.

The plaintiffs rely on their Proposed Findings of Fact, and the facts they propose in response to those proposed by the defendants.

III.    STANDARD OF DECIDING A MOTION FOR SUMMARY JUDGMENT.

Summary judgment should only be granted if the record shows that there is no genuine issue of material fact. EEOC v. Target, 460 F.3d 946, 954 (7th Cir. 2006). When making such a determination, a court must draw all reasonable inferences in favor of the non-moving party. EEOC v. Target, 460 F.3d at 954. Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles, such as this case. Alexander v. Wisconsin Dept. Of Health, 263 F.3d 673, 681 (7th Cir. 2001). Cases that involve issues of intent and credibility are not appropriate cases to be decided on summary judgment. Alexander, 263 F.3d at 681.

IV.     THE ESTATE'S SEC. 1983 CLAIMS SHOULD NOT BE DISMISSED.

   A.     *Legal standard and analysis of the deliberate indifference claims.*

The Constitution guarantees persons in local custody a limited right to be protected from harm.  Mombourquette v. Amundson, 469 F.Supp.2d 624, 636 (W.D.Wisc., 2007).  In determining whether this right has been violated, the question is whether the defendants were deliberately indifferent to a substantial risk of serious harm.  Mombourquette, 469 F.Supp.2d at 636.  Pretrial detainees are entitled to "at least" the same protection offered convicted prisoners under the Eighth Amendment.  Mombourquette, 469 F.Supp.2d at 636, Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003).[1]

In jail suicide cases, the question is whether the plaintiff has adduced sufficient evidence to allow a reasonable jury to find that a defendant was deliberately indifferent to the plaintiff's health and safety.  Mombourquette, 469 F.Supp.2d at 637.  The deliberate indifference standard requires more than a finding of negligence but less than a showing of intentional harm.  Mombourquette, 469 F.Supp.2d at 637.  The standard has two main parts: first, was the defendant subjectively aware of a substantial risk of serious harm to the plaintiff?  Mombourquette, 469 F.Supp.2d at 637.  Second, if the defendant was aware of the risk, did he respond reasonably to the risk, even if the harm was not ultimately averted?  Mombourquette, 469 F.Supp.2d at 637.  The more serious the possible injury, the lower the threshold for showing that the risk was substantial.  Mombourquette, 469 F.Supp.2d at 637.  The Constitution demands that officials take reasonable steps when they are aware of a substantial risk of harm.  Mombourquette, 469 F.Supp.2d at 638.

---

[1] The test for deliberate indifference is the same under both the Eighth and the Fourteenth Amendments.  Sherrod v. Lingle, 223 F.3d 605, 610 (7th Cir. 2000).

A plaintiff may use circumstantial evidence to persuade the finder of fact that the defendant was aware of the risk, despite the defendant's protestations to the contrary. Mombourquette, 469 F.Supp.2d at 638. Further, although a defendant is not liable for obvious risks of which she remained unaware, the obviousness of the risk may be used as evidence that the defendant was aware that danger was present, i.e., a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Mombourquette, 469 F.Supp.2d at 638. Knowledge of risk may be inferred if the risk was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past. Mombourquette, 469 F.Supp.2d at 641. In cases in which the inmate had already demonstrated a tendency to harm herself, courts have held uniformly that a genuine dispute remains whether the defendants were aware of substantial risk of serious harm, even when the inmate denied feelings of suicide. Mombourquette, 469 F.Supp.2d at 644. The Constitution does not reward those who play ostrich. Mombourquette, 469 F.Supp.2d at 645.

To prevail, it is not necessary for the plaintiff to show that a defendant was a monster or had no concern for the plaintiff's well-being. Mombourquette, 469 F.Supp.2d at 650. The standard of deliberate indifference does not require a showing of malicious intent or ill will toward the plaintiff. Mombourquette, 469 F.Supp.2d at 650. A plaintiff must show no more than that the defendant knew of the risk and did not act reasonably to abate it. Mombourquette, 469 F.Supp.2d at 650.

In order to prevail on a section 1983 deliberate indifference claim, a plaintiff need not show that she was literally ignored by the staff. Sherrod, 223 F.3d at 611. As the Sherrod Court noted, "If knowing that a patient faces a serious risk of appendicitis, the prison official gives the

5

patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate indifference although the prisoner was not 'simply ignored.'" Sherrod, 223 F.3d at 611-612.

The Mombourquette case is similar in many respects to this case. In Mombourquette, the plaintiff, Brenda Mombourquette, was detained in the Monroe County Jail. Mombourquette, 469 F.Supp.2d at 626. One of the defendants was a registered nurse, Jeanne Reinart. Mombourquette, 469 F.Supp.2d at 628. Reinart received training in suicide and mental health assessments, and she was taught to record the facts she observed. Mombourquette, 469 F.Supp.2d at 628.

Like Tierra Hill, Mombourquette had prior stays in jail. Mombourquette, 469 F.Supp.2d at 629. And like Hill, Mombourquette had acted in a way indicating that she intended to harm herself during those earlier stays. Mombourquette, 469 F.Supp.2d at 629-630. Another similarity is that both Hill and Mombourquette were on drugs for depression. Mombourquette, 469 F.Supp.2d at 629. And just like Mombourquette, many questions on the screening document were left unanswered. Mombourquette, 469 F.Supp.2d at 629. While in custody, Mombourquette made numerous comments about not wanting to continue living. Mombourquette, 469 F.Supp.2d at 630. Mombourquette cut at her wrists with a lens from her eyeglasses, which the jail personnel referred to as a "suicide attempt." Mombourquette, 469 F.Supp.2d at 631.

Unlike Richards in this case, Reinart definitely asked Mombourquette if she intended to harm herself, and Mombourquette promised that she would not. Mombourquette, 469 F.Supp.2d at 632. (Reinart did not record the fact that she had gotten Mombourquette to contract no self-harm). Mombourquette, 469 F.Supp.2d at 633. Reinart even noted that Mombourquette needed

6

to be watched closely. Mombourquette, 469 F.Supp.2d at 633. But just as Richards told no one that Hill claimed to have tried to kill herself, Reinart told no one about instructions from the hospital that Mombourquette was supposed to be on a suicide watch. Mombourquette, 469 F.Supp.2d at 632-633.

On November 22, Mombourquette tried to kill herself. Mombourquette, 469 F.Supp.2d at 634-635. She was unsuccessful in ending her life, but she caused herself severe brain damage. Mombourquette, 469 F.Supp.2d at 634-635. In the days leading up to the attempt, very little attention was given to her by Reinart, and Mombourquette displayed no acute signs that she was about to harm herself. Mombourquette, 469 F.Supp.2d at 634-635.

Mombourquette's estate made a deliberate indifference claim, and the District Court ruled on the defendants' motion for summary judgment. The arguments raised by the Mombourquette defendants are very similar to those raised by the defendants in this case. In the Mombourquette case, the defendant argued that she were unaware of the risk. In response, the Court held that previous attempts at self harm would be sufficient to create a jury question: when a defendant was aware of a recent suicide attempt, it would be improper for a court to grant summary judgment on the issue of whether a defendant was aware of a substantial risk of harm. Mombourquette, 469 F.Supp.2d at 638. There is no dispute that Richards knew Hill's suicidal tendencies from earlier jailings, and that Hill had been placed on suicide watch at least one time before. Nor is there a dispute that Richards knew Hill had engaged in self-harm only days before their May 17 meeting, and that Hill had described it as a suicide attempt. By itself, this is enough evidence to defeat the defendants' motions for summary judgment.

Reinart also argued that she should be absolved from liability because she exercised professional judgment. The Mombourquette Court rejected those arguments. First, the Mombourquette noted that Reinart had little training in suicide prevention, thus diminishing the argument that Reinart was able to make professional judgments. Mombourquette, 469 F.Supp.2d at 640. Richards actually had less – or at least no more – training in suicide prevention than Reinart. Second, the Court held that there was an issue of material fact over whether Reinart actually used professional judgment. Mombourquette, 469 F.Supp.2d at 640. The Mombourquette noted that the only evidence that Reinart used professional judgment in determining that Mombourquette was not a suicide risk was the notation that Mombourquette denied "ideas of self harm or suicidal thoughts," and that was not enough. Mombourquette, 469 F.Supp.2d at 640.[2] Yet, that is more than one finds in the record in this case: there is no documentary evidence that Richards was using her professional judgment on May 17. Indeed, after the suicide, Richards claimed that Hill was the last person in the world she expected to kill herself – the thought of Hill killing herself, Richards implies, never even crossed her mind. In other words, the record does not indicate an errant judgment on Richards' part; instead, it indicates no judgment at all. Accordingly, it would be impossible for Richards to have made a judgment on May 17 about whether Hill was or was not at risk for suicide.[3]

---

[2] Richards documented that Hill stated she wanted to attend SOAR, that she needed a place to stay after she was released, that she was covered under her mother's insurance as long as she remained in school, and that she intended to see her psychiatrist in the near future. Kinne aff., exh. P. There is nothing in this note indicating that Hill's statements had any affect on Richards' thinking at the time.

[3] The Mombourquette Court also rejected Reinart's attempt to play semantics over whether Mombourquette's suicide attempt was "serious." Mombourquette, 469 F.Supp.2d at 642-643.

8

The defendants claim that Richards was using her professional judgment when she allegedly concluded that Hill was not a suicide risk because she was talking about events in the future. There is no indication in the records that Richards actually went through this thought process at the time: she did nothing more than indicate that Hill was planning on seeing her doctor and restarting her medication. Regardless, in Mombourquette, the plaintiff was future oriented, speaking about wanting to see her children again. The Court still allowed that case to go to the jury.

Even if the Court finds that Richards did use professional judgment, a jury could still conclude that she displayed a deliberate indifference to the risk of suicide. Deliberate indifference may be inferred when the medical professional's decision is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such a judgment. Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001). Dr. Spierer has testified that there was a departure from the standard of care. A jury could reasonably conclude that Richards' decision not to tell anyone that Hill characterized her act of self-harm as a suicide attempt, coupled with Richards' knowledge of Hill's history and her decision either not to ask or record questions of Hill about her suicidality, was a *substantial* departure from accepted professional judgment.

The defendants in this case also claim that a lack of suicidal indicators after May 17 absolves them of liability. That argument was also rejected in Mombourquette. In Mombourquette, there was at least one other meeting between Mombourquette and Reinart. Mombourquette, 469 F.Supp.2d at 645. In this case, there was no meeting with any mental health staff personnel after Richards' May 17 meeting with Hill. Likewise, Richards' complete

9

failure to respond at all to Hill's conduct makes it possible for a jury to conclude that her response was not reasonable. Mombourquette, 469 F.Supp.2d at 645-646. Richards told *no one* that Hill herself characterized the thumbtack poke as a suicide attempt. This was not a reasonable response.

Other cases support the plaintiff's position. In Hall v. Ryan, 957 F.3d 402 (7th Cir. 1992), the Court of Appeals held that where officials fail to take appropriate steps in situations where they are aware of both bizarre behavior *and* a history of suicidality, it is a jury question as to whether the officials were deliberately indifferent to the risk of suicide. Hall, 957 F.3d at 405.

The case of Cavalieri, the Court held that a claim for deliberate indifference could survive where the record showed that the official knew of a suicide risk but did little to nothing about it. Cavalieri, 321 F.3d at 621-622. The Cavalieri Court also held that simply because the defendant did something in reaction to the suicide risk, it did not necessarily absolve the defendant of liability. The fact that the Cavalieri defendant failed to take the simple step of informing others of the suicide risk in the jail was enough for a jury to find deliberate indifference in that case. Cavalieri, 321 F.3d at 622. The most Richards can claim she did in reaction to Hill's description of a recent suicide attempt is 1) she extracted a promise of no harm from Hill, but failed to record it in the note, and 2) mentioned the thumbtack poke to Andrew, but did not say anything about Hill's description of that as a suicide attempt[4]. She did less than the Cavalieri defendant. Accordingly, the motions for summary judgment should be denied.

---

[4] Even if the Andrew/Richards "consultation" occurred after May 17, there is no documentation of it.

In sum, a jury has the following to consider. Richards worked for a company hired to provide suicide assessments in the Dane County Jail without any company policies instructing Mental Health Center employees how to identify inmates who might be suicide risks. (Andrew depo. pp. 12, 59; Richards depo. p. 13). Moreover, the Mental Health Center did not provide training to social workers with respect to identifying suicide risks among the inmates. (Andrew depo. p. 59). Richards herself had no formal education about how to identify suicide risks in people. (Richards depo, p. 24). However, Richards was trained to record in the inmate's medical records promises of no-self harm and the answer to the question, "Are you planning to kill yourself?" (Andrew depo., pp. 42-43).

Richards would have reviewed Hill's jail records before meeting with Hill on May 17, 2004. (Richards depo, p. 58). From that, Richards would have known that a little over a year prior to their May 17 meeting, Hill had been placed on suicide watch in the Dane County Jail. (Kinne aff., exh. B).

Richards knew first hand from prior meetings that Hill had talked of suicide and wanting to die. (Richards depo. pp. 79-80; Kinne aff., exhd. D, E). When Hill made those comments, Richards recorded that Hill did not intend to kill herself, and Richards recorded Hill's promise not to harm herself. (*Id.*).

On May 17, Richards knew that Hill had been diagnosed with depression and that her doctor had prescribed 20 mg of Prozac to treat that depression. On May 17, Richards knew that Hill had not been taking her Prozac for nearly one month. (Kinne aff., exh. E, Richards depo, page 82-83).

On May 17, Richards knew that Hill was in a cell with a sheet, in a cellblock that prevented other inmates from seeing her at all and that made it difficult for guards to see her. (Richards depo, pp. 56-57). In other words, Richards knew Hill was in an environment which would make it very easy for her to kill herself. (Richards depo, page 59-60).

A jury could believe that Deb Anderson had brought Hill's suicide attempt to Richards' attention. (Anderson depo., p. 25). Given Richards' claim that the May 17 meeting was not a suicide assessment (at least not in the beginning), her dismissal of Anderson's warning gives credence to the claim that Richards was deliberately indifferent to the suicide risk. (Richards depo, page 56, 93). Regardless, even after the May 17 meeting, Richards testified that she did no more than an "informal" suicide assessment during the meeting, again suggesting deliberate indifference to the risk. (Richards depo, page 90-91).

Crucially, Hill told Richards that she had tried to kill herself days prior. (Richards depo, page 88, Kinne aff., exh. J). Richards would have known this was more than an attention getting scheme because Hill told no one about it at the time.

A jury could conclude that Richards is trying to have it both ways with the note from the May 17 meeting. Richards claimed that she asked Hill if Hill intended to commit suicide and asked her to promise not to harm herself. (Richards depo, p. 91-92). There is no record of Richards actually asking these questions, or getting any answers. Given how Richards was trained and what she typically did, a jury could conclude that Richards never asked these questions at all. In other words, a jury could conclude that Hill told Richards about this recent suicide attempt but Richards did not even bother to ask her if she were suicidal and to extract a promise of no harm. This failure is clear evidence of deliberate indifference.

12

Alternatively, if Richards did ask, she did not think it was important enough to write down her questions and Hill's answers, again suggesting deliberate indifference to the risk. The fact that Richards was very busy, and the fact that the Mental Health Center was understaffed only make it more likely that Richards was deliberately indifferent: she had a lot of other work to do and, in her mind, more important issues demanding her attention. (Richards depo, p. 92).

Richards claims that she did not perceive Hill to be a suicide risk. (Richards depo, page 91-92). However, she testified that she wrote down the description of the thumb tack incident and described it as a suicide attempt because she thought it was important, and it was an example of out-of-the-ordinary behavior. (Richards depo, page 89). She also claims to have asked Hill if she intended to kill herself and she had Hill promise not to do so, even though she did not write that down. ( Richards depo, page 61, Kinne aff., exh. J). From this, a jury could conclude that Richards indeed did see Hill as a suicide risk, she was simply indifferent about it.

Richards' failure to tell Andrew about the suicidal aspect of Hill poking herself with the thumbtack is further evidence of indifference. It is also evidence that Richards' was not exercising professional judgment. No where does Richards document any conclusion on her part that Hill was not a serious suicide risk, nor does she list the factors she weighed in coming to that conclusion.

Finally, Richards' complete lack of follow-up, or asking anyone else to follow-up, indicates that no professional judgment was at stake. She simply did not think about it, in spite of the obvious and known risk. She was deliberately indifferent to that risk. For these reasons, the defendants' motions for summary judgment should be denied.

B.  *The plaintiff is under no obligation to produce expert testimony to establish deliberate indifference as long as the plaintiff has produced expert testimony about the underlying medical condition.*

The defendants claim that the plaintiff's lack of an expert opinion on the issue of deliberate indifference dooms the estate's section 1983 claim.[5] However, in Ledford v. Sullivan, 105 F.3d 354 (7th Cir. 1997), the Court of Appeals held that the plaintiff did not need expert testimony on the issue of deliberate indifference itself. Ledford, 105 F.3d at 358-359.

Other cases complement the Ledford decision. In the Sherrod case, the plaintiff began complaining of stomach pain on March 9, and was repeatedly seen by health care providers over the following two weeks. Sherrod, 223 F.3d at 608-609. More than one health care provider noted in the plaintiff's records that appendicitis had to be ruled out. Sherrod, 223 F.3d at 608-609. On March 24, the plaintiff's ruptured appendix was finally removed, and he was diagnosed with a gangrenous bowel  Sherrod, 223 F.3d at 609.

The Sherrod plaintiff sued, alleging deliberate indifference. Sherrod, 223 F.3d at 609. As a discovery sanction, the trial court disallowed the plaintiff's experts. Sherrod, 223 F.3d at 609-610. The trial court dismissed the plaintiff's deliberate indifference claim on summary judgment. Sherrod, 223 F.3d at 610.

The Court of Appeals reversed. It noted the two part test: the plaintiff must show that the medical condition was objectively serious, and the state officials acted with deliberate indifference to his medical needs, which is a *subjective* standard. Sherrod, 223 F.3d at 610. The Sherrod Court went on to hold that the subjective standard requires the court to find that the

---

[5] The defendants suggest that Dr. Spierer's opinion is that Richards was not deliberately indifferent. On the contrary, Dr. Spierer has no opinion one way or the other about deliberate indifference. Spierer Supp. Aff., para. 15.

14

official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also draw that inference. Sherrod, 223 F.3d at 611. Based on the facts in Sherrod, and *without any expert testimony on the deliberate indifference issue*, the Court held that the Sherrod plaintiff could prevail before a jury. Sherrod, 223 F.3d at 611.

In the case of Cooper v. Casey, 97 F.3d 914 (7th Cir. 1996), the plaintiff prisoners complained of pain from abuse by guards where no medically objective evidence of injuries existed. Cooper, 97 F.3d at 917. The Court of Appeals held that the plaintiffs did not need to call experts to establish that the beatings caused them pain. Cooper, 97 F.3d at 917. The Cooper Court also noted that in some cases expert testimony might be required to establish the existence or gravity of a particular medical condition or harm. Cooper, 97 F.3d at 917. However, the Cooper Court did *not* require expert testimony on the issue of deliberate indifference itself. *See also* Williams v. Liefer, 491 F.3d 710 (7th Cir. 2007) (Court required expert testimony on the medical condition itself, but not on the issue of deliberate indifference). In this case, Dr. Spierer, the plaintiffs' expert, has provided the necessary testimony about the gravity of Hill's condition. It is for the jury to determine if Richards' choice to ignore the clear signs of suicide risk was deliberate indifference.[6]

V.    IF THE COURT FINDS THAT HILL DID NOT MEET THE FARMER DELIBERATE INDIFFERENCE STANDARD, THIS CASE SHOULD BE JUDGED UNDER A LIGHTER STANDARD BECAUSE HILL WAS A PRETRIAL DETAINEE.

---

[6] The defendants' attempt to rely on statements from Dr. Spierer about factors that would have contraindicated a suicide risk. The defendants in Mombourquette tried a similar tactic, but the Court rejected that move, holding that the expert at issue in Mombourquette did not confer with any of the defendants during the plaintiff's incarceration. Mombourquette, 469 F.Supp.2d at 644.

In Mombourquette, the district court held open the possibility that the "deliberate indifference" test was inapplicable to pretrial detainees, that instead perhaps a less stringent test would apply. Mombourquette, 469 F.Supp.2d at 636. Applying a lighter burden to pretrial detainees over condition of confinement issues has precedence in the law. *See* Smith v. Copeland, 87 F.3d 265, 268, fn 4 (8th Cir. 1996). It also makes sense to expect more of government officials when it comes to preventing suicide of pretrial detainees. As the Court of Appeals held in Jutzi-Johnson v. United States, 263 F.3d 753 (7th Cir. 2001):

> It is true that jail inmates are much more likely to commit suicide than free persons are – in fact, nine times as likely. According to the study [at hand], 12.9 percent of jail suicides occur within the first three hours of confinement, 32.8 percent within the first 24 hours, 62.1 percent within the first two weeks, 72.8 percent within the first month, 89.2 percent within the first four months, and 97.4 precent within the first seven months. The likelihood of suicide is highest between 2 and 14 days of confinement, and only 10.8 percent of suicides occur after 5 months.

Jutzi-Johnson, 263 F.3d at 757, Cavalieri, 321 F.3d at 621. Given that the Eighth Amendment standard requires a standard between negligence and intentional conduct, it makes sense that a negligence standard (or something closer to that standard) should apply to pretrial detainees. Under that standard, the Estate has clearly met its burden.

VI. THE PUNITIVE DAMAGES CLAIM SHOULD NOT BE DISMISSED.

A jury may be permitted to assess punitive damages in an action under sec. 1983 when the defendant's conduct involves reckless or deliberate indifference to the federally protected rights of others. Alexander v. City of Milwaukee, 474 F.3d 437, 453 (7th Cir. 2007), Woodward v. Correctional Medical Services of Illinois, 368 F.3d 917, 930 (7th Cir. 2004). Because the plaintiff Estate can prove its claim, and because intent is not necessary for an award of punitive

16

damages in a deliberate indifference case, the punitive damages claim against Richards in her individual capacity should not be dismissed.

VII.  PLAINTIFF CONCEDES THAT MINNIE HILL'S SECTION 1983 CLAIMS SHOULD BE DISMISSED.

VIII. IF ALL OF THE FEDERAL CLAIMS ARE DISMISSED, THE STATE LAW CLAIMS SHOULD BE DISMISSED WITHOUT PREJUDICE.

The plaintiffs agree with Richards on this issue. If the Court dismisses the federal claims, it should surrender jurisdiction over the state law claims, dismissing them without prejudice so the plaintiffs can pursue their state law claims in state court.

IX.  EVEN IF THE COURT CONSIDERS THE STATE LAW NEGLIGENCE CLAIMS, THEY SHOULD NOT BE DISMISSED.

Plaintiffs seeking to maintain a negligence action must prove four elements: 1) a duty of care on the part of the defendant; 2) a breach of that duty; 3) a causal connection between the conduct and the injury; and 4) an actual loss or damage as a result of the injury. Janke v. Clark County, 2000 WI 64, para. 52, 235 Wis.2d 700, 731, 612 N.W.2d 297, 311 (2000), Sawyer v. Midelfort, 227 Wis.2d 124, 137, fn 4, 595 N.W.2d 423, 430, fn 4 (1999). Under Wisconsin law, the concept of negligence is peculiarly elusive, and requires the trier of fact to pass upon the reasonableness of the conduct in light of all the circumstances, even where historical facts are concededly undisputed: negligence is ordinarily not a decision for the court. Bain v. Tielens Construction, 2006 WI App 127, para. 6, 294 Wis.2d 318, 324, 718 N.W.2d 240, 243 (Ct.App. 2006).

Both defendants claim that a finding of negligence cannot be supported because the plaintiffs' expert testified that Richards was not negligent. In fact, he testified that if at the time of Richards' meeting with Tierra Hill on May 17, 2004, Richards knew a) that Hill was in solitary confinement, making it difficult for her to be seen by other guards and inmates; b) that Hill had a history of suicidality; c) that Hill suffered from depression; d) that she was prescribed anti-depressants but had not been taking them for at least close to one month; e) that Hill engaged in an act of self-harm within days of Richards' May 17 meeting with Hill, and f) that Hill characterized her act of self-harm as a suicide attempt, it was below the standard of care for Richards not to conclude that Hill was a suicide risk. Spierer affidavit / report, para. 5. Plaintiffs can prove that Richards knew that Hill was in solitary confinement; that Hill had a history of suicidality; that Hill suffered from depression; that Hill had not been taking her Prozac for the depression for over three weeks; and that Hill had engaged in a recent act of self harm that Hill described as a suicide attempt. Therefore, Richards was negligent for not concluding that Hill was a suicide risk after the May 17 meeting.

The defendants latch on to testimony from Dr. Spierer where he stated that he would not have been critical of Richards if she concluded that Hill's case was a close call, and then conferred with her colleagues about the case. Of course, there is no evidence that Richards concluded it was a close call. In fact, the evidence is that she barely thought about it. Regardless, there is no evidence that Hill conferred with Andrew *about her conclusion that it was a close call*. In fact, according to Andrew, Richards mentioned the thumbtack without saying a word about Hill's description of it as a suicide attempt. Regardless, Dr. Spierer will testify that the "consultation" described in Andrew's deposition did not meet the definition of the

18

hypothetical consultation he mentioned in his deposition. Spierer Supp Aff., para. 9. (Oddly, Richards herself has no memory of such a consultation).

The Mental Health Center also argues that Anderson's and Marie Hill's opinion about Tierra Hill's suicide risk is important to the negligence question. (Marie Hill is Tierra Hill's mother). There is no evidence in the record that Richards knew either Anderson's opinion about Tierra's suicidality, or Marie's opinion on the topic. Indeed, the only information in the record about what Richards knew from Anderson is that Anderson was worried enough about Hill's suicide risk to ensure that Richards met with Hill immediately after Anderson learned of the thumbtack incident.

Finally, the Mental Health Center mentions in passing that the plaintiffs cannot prove cause. Dr. Spierer will testify that it was negligent for Richards not to have found Hill to be a suicide risk on May 17. If Richards had concluded Hill to be a suicide risk, she would have placed her on suicide watch. On suicide watch, Hill would have been very closely observed, and she would not have had a sheet or other means by which to kill herself. From those facts, a jury can conclude that Richards' negligence caused Hill's death.

X.   CONCLUSION.

The plaintiffs do not suggest that Richards wanted Hill to die. Nor do they suggest that she was indifferent about Hill's death. The Estate can prove that Richards was deliberately indifferent to the *risk* of Hill's suicide. For the reasons stated above, the Court should deny both motions for summary judgment. In the alternative, if the federal claims are dismissed, the Court should dismiss the state law claims without prejudice.

Dated this 28th day of September, 2007.

                                            s/ Paul A. Kinne  
                                            State Bar No.: 1021493  
                                            Attorney for Plaintiff  
                                            Gingras, Cates & Luebke, S.C.  
                                            8150 Excelsior Drive  
                                            P.O. Box 1808  
                                            Madison, WI 53701-1808  
                                            Telephone: (608) 833-2632  
                                            Fax: (608) 833-2874  
                                            kinne@gcllawyers.com