IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ESTATE OF TIERRA HILL and
MINNIE MARIE HILL,

OPINION AND ORDER

Plaintiffs,

3:06-cv-00732-bbc

v.

MARIE RICHARDS (in her individual and official capacities)
and MENTAL HEALTH CENTER of DANE COUNTY,[1]

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Shortly after 19-year-old Tierra Hill was arrested and detained at the Dane County

jail for theft, she met with defendant Marie Richards, a social worker who had treated Hill

in the past.  From her experiences with Hill, defendant Richards knew that Hill had a history

of depression, that she had been prescribed multiple medications for depression and that she

previously had expressed a desire to die.  Richards also knew that Hill had not been taking

---

[1] Plaintiffs have dropped their claims against Prison Health Services, Inc. and Dane County.  I have omitted defendants "ABC Insurance Company" and "DEF Insurance Company" from the caption because plaintiffs never identified these insurance companies or served them with a complaint.  Finally, because plaintiffs failed to respond to defendants' argument that plaintiffs cannot prevail on a claim against defendant Marie Richards in her official capacity, that claim will be dismissed .

1

her medication for several weeks and that she was being housed in segregation at the jail, where neither other prisoners nor staff could easily monitor her.

During the meeting, Hill told Richards that she had attempted suicide just before her arrest by trying to break open a vein on her arm with a tack.  Defendant Richards did not place Hill on suicide watch or provide any follow up care.  Richards told her supervisor that Hill had tried to "scratch herself" with a tack, but she said nothing about Hill's characterization of the incident as a suicide attempt.  Three days later Hill was dead, having committed suicide in her cell by hanging herself with a bed sheet.

Plaintiffs Minnie Marie Hill and the Estate of Tierra Hill filed this lawsuit under 42 U.S.C. § 1983 and state law, contending that defendant Richards failed in her constitutional and common law duties to protect Hill from suicide and that defendant Mental Health Center was vicariously liable under state law for Richards's negligence.  (In addition, plaintiff Minnie Hill initially asserted a claim for a violation of her rights of familial association.  In their brief, plaintiffs concede that Minnie Hill's claims should be dismissed.  Accordingly, I will refer to the Estate of Tierra Hill as "plaintiff" for the remainder of the opinion.) Defendants' motion for summary judgment is ripe for review.

With respect to plaintiff's constitutional claim against defendant Richards, the issues raised in defendants' motion are the same as in most cases involving an alleged failure to protect an incarcerated person from harm:   (1) was defendant Richards aware of a

substantial risk that Hill would harm herself? and (2) if so, did Richards respond reasonably to that risk? As with so many legal issues, there are no clear answers to the questions that underlie these determinations, such as when a risk becomes "substantial," when it is reasonable to infer that a defendant was aware of that risk and what constitutes a "reasonable" response.

In the parties' attempt to answer these questions, the primary dispute involves the nature of Hill's first act of self harm.  Although I agree with defendants that scratching oneself with a thumbtack may not seem serious on its face, Hill's characterization of her actions as an attempt to bleed to death dramatically changes the way one would be likely to view the behavior.  Particularly in light of Hill's mental health history, a reasonable jury could find that defendant Richards was aware of a substantial risk that Hill would harm herself more seriously.  Along the same lines, I cannot conclude as a matter of law that defendant Richards responded reasonably to the risk.  By omitting Hill's characterization when telling her supervisor about the conversation, Richards omitted what was clearly the most alarming aspect of Hill's behavior, all but insuring that the supervisor would not take any additional action.  Accordingly, I will deny defendant Richards's motion for summary judgment with respect to plaintiff's constitutional claim.

I decline to exercise supplemental jurisdiction over plaintiff's state law negligence claim.  Under 28 U.S.C. § 1367(c)(1), a court may decline to hear a state law claim if "the

claim raises a novel or complex issue of State law."  As discussed in detail by the court in

Taylor v. Wausau Underwriters Insurance Co., 423 F. Supp. 2d 882, 897-901 (E.D. Wis.

2006), there is a split among state courts on the question whether prison officials may be

held liable for negligence in preventing a prisoner's suicide.  Although the majority of courts

have held that liability may be imposed, some have held that a prisoner's suicide is a

"superseding cause" of the harm that relieves the defendant of liability.  The rationale for the

rule boils down to the view that a defendant should not be held liable for the intentional acts

of another party.

    Wisconsin courts have not yet weighed in on this debate.  At first blush it might seem

somewhat enlightening that the Wisconsin Court of Appeals has applied the "superseding

cause" limitation in a case in which a teenager committed suicide while truant from school.

(The boy's parents sued the school district on the theory that school officials were negligent

in failing to follow a school policy to report the student's unexcused absence to his parents.)

McMahon v. St. Croix Falls School District, 228 Wis. 2d 215, 596 N.W.2d 875 (Ct. App.

1999).  However, it appears that nearly all courts have applied the superseding cause

limitation to suicides as a general matter.  Taylor, 423 F. Supp. 2d at 898.  The judicial

debate is whether it should apply when the defendant had a custodial relationship with the

decedent, on the ground that in such cases the defendant has a heightened obligation to

prevent harm.  In McMahon, the court noted that some courts have applied such an

4

exception to the general rule, but the court had no reason to determine whether Wisconsin should adopt it.  In <u>Taylor</u>, the court noted arguments for and against the exception before declining to exercise supplemental jurisdiction over the claim.

Because Wisconsin courts have not yet decided whether the superseding cause limitation applies in the prison context, deciding plaintiff's negligence claim would require resolution of a novel question of state law.  The language of § 1367(c)(1) is discretionary; district courts are not always required to avoid deciding a state law claim simply because it requires resolution of difficult questions.  However, in this case, neither side developed any argument regarding whether the superseding cause doctrine applies.  Defendant Richards simply notes the issue's uncertainty and asks the court to decline to decide it.  Presumably, plaintiff is similarly reluctant to stake a position: it completely ignored the issue in its response brief.

I believe it is unwise to break new ground in a case in which no party could be bothered to make an argument on the appropriate rule of law.  Accordingly, I will invoke § 1367(c)(1) and decline to exercise jurisdiction over plaintiff's state law claim.  (This conclusion leaves Richards as the sole defendant.  Accordingly, I refer to her as "defendant" for the remainder of the opinion.)

Finally, after plaintiff filed its response to defendants' motion for summary judgment, defendant Mental Health Center filed a motion to strike a supplemental affidavit of

plaintiff's expert.  Because I am not considering plaintiff's claim against defendant Mental Health Center, that  motion will be denied as moot.  (It would be denied as unnecessary in any event; I did not consider the supplemental affidavit in deciding defendant's motion for summary judgment.)

From the parties' proposed findings of fact and the record, I find the following facts to be undisputed.


UNDISPUTED FACTS

On May 15, 2004, 19-year-old Tierra Hill was arrested and taken to the Dane County jail, where she was placed on a probation hold and charged with retail theft and "obstructing."  This was the third time that plaintiff had been incarcerated since she was 17.


A.  <u>Previous Incarcerations</u>

At the time of her May 2004 arrest, Hill had been struggling with depression for some time.  During a previous incarceration in January 2003, jail staff had placed Hill in a "suicide smock" after Hill made "suicidal comments."

Plaintiff met defendant Marie Richards at the Dane County jail in November 2003. Defendant was a social worker who had been providing services for incarcerated persons since 2001.  She was employed by the Mental Health Center of Dane County, which had

6

a contract with Dane County to provide mental health services to prisoners at the Dane County jail.

At a meeting with defendant on November 6, 2003, Hill said "she wouldn't mind if she died in her sleep." Approximately one week later, Hill was placed in segregation "because she was repeatedly asking for a grievance for a non-grievable offense." Defendant met with her because she was "exhibiting a flat affect and was curled on the floor ne[x]t to the toilet." During their meeting, Hill sat on the floor, rolling back and forth. She told defendant that she had not been eating or sleeping well and believed "nothing will ever change." Hill admitted to defendant that she wished she wouldn't wake up in the morning. In her progress notes, defendant wrote that Hill "contracted no self harm."

In December 2003, Hill was taking multiple medications for depression, including trazodone and Prozac. She reported depression and "suicidal feelings" to the psychiatrist she was seeing at the Mental Health Center. In his assessment, the psychiatrist wrote that staff "will need to continue to monitor" Hill for suicide risk.

Each of these events is recorded in Dane County jail records.

### B. Release from Jail

In February 2004, Hill was released from jail. At the time, she was still taking Prozac. In late February, Hill met with a psychiatrist at Dean Medical Center who diagnosed

plaintiff with major depressive disorder and attention deficit hyperactivity disorder.  At a second meeting on March 1, the psychiatrist observed that Hill was "extremely relieved to be out of jail"; he concluded that her major depression was "in remission."  However, in the following weeks, Hill stopped going to school, stopped seeing her therapist and began to use drugs and alcohol again.

### C. May 2004 Arrest

When Hill was arrested in May 2004, she had not been taking her prescribed medication for several weeks.  Jail records indicate that Hill had a "chronic problem" with depression.

On the same evening she was arrested, Hill met with Liane Nakamara, "a clinical specialist with the mental health jail team."  Hill told Nakamara that she had not been taking her medication, that she felt alone, that she did not have the support of her mother and that she had not been going to school because she felt, "what's the use?"  Nakamara gave Hill a message from Hill's mother, Minnie Marie Hill, that she was not to call her from jail. In her progress notes, Nakamara observed that Hill was crying but denied suicidal ideation. Nakamara refused to give Hill "mental health clearance" because she was "quite depressed." (The parties do not propose any facts regarding the meaning of "mental health clearance." Presumably, it means that clinical staff have determined that the prisoner does not need

8

special treatment because of mental health problems.)

On May 16, Hill met with another "mental health worker." (Some documents refer to this staff member as Erin "Hibma"; others refer to her as Erin "Thompson." The parties do not resolve the discrepancy.) Hill denied suicidal ideation but the mental health worker refused to give Hill mental health clearance because she was "experiencing MH issues."

On May 17, Hill was moved to "administrative confinement" because "she had a history of difficulty [in] getting along with other women and being physically resistive and fighting with the staff." In administrative confinement, Hill remained locked down in her cell and in isolation 23 hours a day. The cells are not monitored by cameras and prisoners cannot see each other. To observe prisoners in administrative confinement, staff must walk past the cell. This occurs up to five times over an eight-hour shift.

### D.  Meeting with Defendant Richards

Also on May 17, Hill met with defendant. (The parties dispute why defendant met with Hill. Plaintiff says it was because another staff member asked her to because Hill had made a suicide gesture; defendant says she decided on her own to speak with Hill. This dispute is not necessarily material because plaintiff does not allege that the other staff member told defendant anything that she did not learn for herself during her conversation with Hill.) Defendant's duties included assessing prisoners' mental health and responding

9

to "mental health emergencies" at the jail.  If defendant believed a prisoner was suicidal, it was her responsibility to convey that information to the sheriff's deputies and her coworkers and document it.  In addition, she was supposed to instruct staff to place the prisoner on a suicide watch and follow up with the prisoner the next day.  (A prisoner on suicide watch is monitored at least every 15 minutes, given a "tear-proof" blanket and placed in a "suicide smock.")

While working for the Mental Health Center, defendant learned how to assess suicide risks.  Important factors to consider in making that assessment include the person's current mental state, history of depression and other mental health issues, medications that the person is taking or should be taking, plans for the future and previous attempts of self harm.  "Sincere" suicide attempts should not be treated differently from self harm inflicted to get attention.  More recent attempts of self harm are more indicative of a current risk for suicide than older ones.  In addition, an assessment should include questions whether the person is suicidal and questions to determine whether the person is future-oriented.

When defendant met with Hill on May 17, she knew that Hill had been diagnosed with depression, that she had been prescribed antidepressive medication, that she had not been taking her medication for three weeks and that she was housed in administrative confinement.  Typically, defendant reviews a prisoner's jail records before a meeting.

Hill told defendant that she had "poked" herself on her wrist with a thumb tack on

the day she was arrested, that she attempted to hit a vein and that she "would have bled to death" if "she would have hit the vein or artery right."  Hill characterized the incident as a "suicide attempt."  Defendant did not ask to see Hill's arm.

Immediately following her meeting with Hill, defendant summarized the meeting in her progress notes, writing what she believed was important:

> Tierra came back to jail Saturday charged with retail theft, resisting and obstructing (for giving police a false name) and a probation hold.  She states that she "poked herself" with a thumbtack in a suicide attempt Saturday—before she was arrested.  She said that if she would have hit the right vein or artery she would have bled to death.
>
> She has not been on any medication since shortly after leaving jail the first time.  She said this is because her mother won't let her have her medications and will only dole them out day by day.
>
> She said she wants to go to SOAR because she knows too many bad things about ARC—including that she won't be able to live with a roommate.
>
> She said she needs: a place to stay (other than her mother's house), SOAR, a better way to get around (not her mom driving her), and money.  She states that her mother and siblings will be moving at the end of May and she does not want to go with them.  They don't have anything rented yet so may end up in a hotel short-term.
>
> She said she is covered under her mother's insurance until she is 25-years-old, as long as she is in school.
>
> She has an appointment with her psychiatrist on May 24 and was planning on restarting her medications at that time.

Although defendant generally documents it when she extracts a promise from someone not to kill herself and she believes it is important to document such information,

she made no notation of extracting a "no harm" promise from Hill. Also missing from defendant's notes is any reference to a question to Hill asking whether she was suicidal. (The parties dispute whether defendant actually extracted a "no harm" promise from Hill or asked her whether she was suicidal.)

After the May 17 meeting, neither defendant nor any other mental health staff member saw Hill again. Defendant spoke to Barb Andrew, her supervisor, telling her that Hill had "tried" to "scratch herself" with a tack. She said nothing about Hill's characterizing the incident as a suicide attempt.

## E. Hill's Suicide

Hill remained in administrative confinement. On May 20, 2004, a prisoner informed officer Kari Orn that Hill had "fallen" in her cell. When Orn entered Hill's cell, she discovered Hill hanging from a bed sheet. She was pronounced dead later that evening at Meriter Hospital.

## OPINION

The constitutional rights of incarcerated persons are limited, but they include basic needs related to health and safety. In Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court held that prisoners have a right to treatment for "serious medical needs." These may

include a broken bone, <u>Duncan v. Duckworth</u>, 644 F.2d 653, 654 (7th Cir. 1981), debilitating pain, <u>Jones v. Simek</u>, 193 F.3d 485, 490 (7th Cir. 1999), or even a mental health condition, <u>Meriwether v. Faulkner</u>, 821 F.2d 408, 413 (7th Cir. 1987).  And in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), the Court held that the Constitution requires prison officials to protect prisoners from "substantial risk[s] of serious harm" by other prisoners, such as a physical or sexual assault.

In assessing a prison official's duty to suicidal prisoners, a court could be guided by the holding of <u>Estelle</u>, that is, one could view suicide as a medical issue (or more specifically, a mental health issue) and a failure to prevent a suicide as a failure to treat a serious medical need.  Alternatively, one could view suicide as a self-inflicted assault under <u>Farmer</u>, equating the failure to prevent it with a failure to prevent an assault by any other prisoner.

The distinction could be an important one.  If prisoner suicide were viewed solely as a medical issue, one could argue that prison officials could be held liable under the Constitution only if they knew that the prisoner had a mental illness likely to cause a suicide attempt.  In other words, there could be no liability if the prisoner made a "rational" choice to kill herself or died as a result of a botched attempt to get attention or other secondary gain.

This notion is similar to the holdings of some state courts that prison officials cannot be held liable for negligence in failing to prevent a suicide unless the prisoner was insane or

13

otherwise incapacitated.  E.g., Pretty On Top v. City of Hardin, 597 P.2d 58, 61 (Mont. 1979).  The extreme version of this view was set forth in a dissenting opinion in Joseph v. State, 26 P.3d 459 (Alaska 2001).  Chief Justice Matthews wrote that there should be no claim for negligence for failing to prevent a prisoner's suicide unless the prisoner was completely incapacitated because "[p]eople in prison may choose suicide after cool deliberation for a wide variety of reasons that are in no sense unique to their incarceration." Id. at 479-80.

On the other hand, if Farmer provides the relevant standard and the question is simply whether prison officials are aware of a risk that the prisoner will harm herself, the *reason* a prisoner takes her own life is less relevant, if it is relevant at all.  So long as officials know of a risk of self harm, they would be obligated to act, regardless whether the official believed the risk was caused by mental illness, manipulation or a "rational" choice.

In this case, defendant does not argue explicitly that jail officials' duty to prevent suicide is limited to insane prisoners.  But that view is implicit in the parties' dispute regarding whether Hill's first act of self harm was an "attention getting scheme." Plt.'s Br., dkt. #45, at 12; Dft.'s Br., dkt. #58, at 7.  In Mombourquette v. Amundson, 469 F. Supp. 2d 624 (W.D. Wis. 2007), I assumed that the Farmer standard applied to suicide cases and held that the constitutional duty to prevent a suicide existed regardless whether a suicide attempt was the result of mental illness or manipulation.  Because the issue appears to be

14

one that will arise again, I will briefly explain the reasoning underlying the assumption in Mombourquette.

The Supreme Court has never considered the appropriate standard for evaluating a failure to prevent a prison or jail suicide. Although the Court of Appeals for the Seventh Circuit has considered a number of jail and prison suicide cases, it has never stated clearly how or whether the nature of the suicide should affect the analysis. In some cases, the court appears to have applied an assault-type analysis, framing the question simply as whether defendant was aware of a risk of self harm. E.g., Cavalieri v. Shephard, 321 F.3d 616 (7th Cir. 2003). In other cases, the court has adopted the medical model, framing the issue as whether the defendants were aware of a serious medical need. E.g., Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998). Finally, in Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001), the court applied *both* models, choosing one or the other depending on whether the particular defendant was a doctor or lay person.

However, even in the cases applying a medical model, the court has not considered as relevant whether a suicide attempt was a product of mental illness or manipulation. Rather, the court appears to have combined the Estelle and Farmer standards: sometimes treating a risk for suicide as a "serious medical need," but always assuming that the "need" is to prevent the suicide (regardless of its motivation) and not just a need to treat an incapacitating mental illness. (In cases in which the court applied the medical model, its use

15

was limited to determining whether a defendant doctor used "medical judgment" in determining that a prisoner was not a suicide risk.  E.g., Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996) ("deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").)

It would be problematic on a number of levels to conclude that prison officials have a duty to protect prisoners from suicide only when it could be proven that the prisoner was unable to stop herself.  On a practical level, it would be sure to create complicated evidentiary issues in almost every case, requiring the parties to fight over the rationality of the suicide attempt and the court to determine what level of rational volition was sufficient to relieve the defendants of liability.  Even more troubling from a policy perspective, limiting the constitutional obligation to insane prisoners would allow prison and jail staff to sit back and watch a prisoner kill herself in any instance in which they suspected manipulation.

In a few cases, the court of appeals has held that the Eighth Amendment is not violated when the harm alleged was caused in part by the prisoner's own manipulative behavior.  Freeman v. Berge, 441 F.3d 546 (7th Cir. 2006) (no Eighth Amendment violation for food deprivation when prisoner was denied food for refusing to comply with rules

16

regarding food delivery); <u>Rodriguez v. Briley</u>, 403 F.3d 952 (7th Cir. 2005) (same). But in those cases the court was careful to point out that its rationale did not apply to suicide. <u>Freeman</u>, 441 F.3d at 546 ("It does not follow from anything we have said, however, that a prison can allow a prisoner to starve himself to death."); <u>Rodriguez</u>, 403 F.3d at 953 ("At some point, refusal to eat might turn suicidal and then the prison would have to intervene.") Accordingly, I reaffirm the holding in <u>Mombourquette</u> that the duty of a jail official to prevent a suicide does not turn on the reason the prisoner may try to harm herself.

With that understanding of the constitutional duty, I turn to the general framework governing this case, which is "deliberate indifference."  Under that standard, plaintiff must prove two  elements: (1) defendant knew (not just should have known) of  a "substantial risk" that Hill would seriously harm herself; and (2) defendant disregarded that risk by failing to take reasonable measures to abate it.  <u>Farmer</u>, 511 U.S. at 828, 844.  Of course, in considering defendant's motion for summary judgment, the question is not whether plaintiff has proven these elements as a matter of law,  but whether a reasonable jury could find in plaintiff's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Plaintiff suggests that the case "should be judged under a lighter standard" than deliberate indifference because Hill was a pretrial detainee rather than a convicted prisoner. As I stated in <u>Mombourquette</u>, 469 F. Supp. 2d at 636, courts have held that detainees are protected by the due process clause rather than the Eighth Amendment and that the due

process clause entitles detainees to "at least" the same protection as the Eighth Amendment. Although in theory that leaves the door open for holding that detainees are entitled to *more* protection than a convicted prisoner, plaintiff does not cite any case in which the Supreme Court or the court of appeals applied a relaxed standard in a detainee case.  In any event, it is unnecessary to determine whether a different standard might apply because I conclude that plaintiff has met its burden on summary judgment under a deliberate indifference standard.

Before turning to the elements, I note that neither side identifies whether defendant's employer (the Mental Health Center of Dane County) is a public or private entity, only that it contracts with Dane County to provide mental health services to prisoners.  Because defendant does not suggest otherwise, I will assume for the purpose of her motion that she acted "under color of" law  within the meaning of 42 U.S.C. § 1983 and that she is a state actor under the due process clause.  West v. Atkins, 487 U.S. 42 (1988) (doctor providing prisoner medical services under state contract acted under color of law for purposes of § 1983).

## A.   Awareness of the Risk

### 1. Obviousness of the risk

Defendant denies that she was aware of a substantial risk that Hill would harm

18

herself.  If that is true, defendant did not violate Hill's constitutional rights.  "Deliberate indifference" is a subjective standard: even if defendant should have been aware of the risk, she is not liable unless she actually was aware of the risk.  <u>Farmer</u>, 511 U.S. at 837.

But that does not mean that defendant may prevail simply by professing she was unaware of any danger.  <u>Cavalieri</u>, 321 F.3d at 621.  Although ignorance is an absolute defense, plaintiff has the opportunity to prove that defendant's ignorance is feigned, as in any other case in which a defendant's mental state is at issue.  The most common way to accomplish this is to show that the risk was obvious, thus calling into question any assertion that the risk went unnoticed.  In this way the distinction between "did know" and "should have known" is narrowed somewhat for the purpose of summary judgment only: the more apparent the risk would be to a reasonable person, the more reasonable it is to infer that the defendant knew as well.  <u>Farmer</u>, 511 U.S. at 846 n.9 ("If . . . the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness.")

Viewing the evidence in the light most favorable to plaintiff, <u>Lopez v. City of Chicago</u>, 464 F.3d 711, 715 (7th Cir. 2006), I conclude that a reasonable jury could find that defendant was aware of the risk that Hill would attempt to seriously harm herself.  The most important fact supporting this conclusion is Hill's statement to defendant that Hill had tried to kill herself just before she was arrested.

19

As I noted in <u>Mombourquette</u>, the cases are legion in which courts have held or assumed that when an incarcerated person makes an unsuccessful suicide attempt, a jury could find reasonably that officials were aware that another attempt was likely to follow. <u>Woodward v. Correctional Medical Services</u>, 368 F.3d 917, 924, 928 (7th Cir. 2005); <u>Cavalieri</u>, 321 F.3d at 621-22; <u>Hall v. Ryan</u>, 957 F.2d 402, 405 (7th Cir. 1992); <u>Perez v. Oakland County</u>, 466 F.3d 416 (6th Cir. 2006) (Cudahy, J.); <u>Snow ex rel. Snow v. City of Citronelle, AL</u>, 420 F.3d 1262, 1270 (11th Cir. 2005); <u>Turney v. Waterbury</u>, 375 F.3d 756, 760 (8th Cir. 2004); <u>Brown v. Harris</u>, 240 F.3d 383, 390 (4th Cir. 2001); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 669 (3d Cir. 1988); <u>Cabrales v. County of Los Angeles</u>, 864 F.2d 1454 (9th Cir. 1988); <u>Partridge v. Two Unknown Police Officers</u>, 791 F.2d 1182 (5th Cir. 1986); <u>Robey v. Chester County</u>, 946 F. Supp. 333, 337-38 (E.D. Pa. 1996). <u>See also</u> <u>Bradich ex rel. Estate of Bradich v. City of Chicago</u>, 413 F.3d 688 (7th Cir. 2005) (concluding that defendants were not deliberately indifferent in failing to prevent suicide while noting that inmate had not tried to injure himself before).

Defendant cites no cases to the contrary. The closest she comes is <u>Matos ex rel. Matos v. O'Sullivan</u>, 335 F.3d 553, 554 (7th Cir. 2003), which involved a prisoner who committed suicide after making an unsuccessful attempt *three years earlier*. Because Hill had engaged in an act of self harm only a few days before the suicide occurred, <u>Matos</u> is not instructive. <u>See also</u> <u>Drake ex rel. Cotton v. Koss</u>, 445 F.3d 1038, 1043 (8th Cir. 2006)

20

(prison guards not liable for failing to prevent suicide despite prisoner's previous suicide attempt when they relied on psychiatrist's opinion that prisoner was not suicidal).

The dearth of contrary case law is not surprising.  It is difficult to imagine a more obvious indicator of a potential suicide than a previous suicide attempt, which is why courts have not hesitated to permit constitutional claims to go forward against officials aware of previous attempts, even when those officials were not trained to recognize suicidal indicators.  Disregarding knowledge of a past suicide attempt is little different from failing to separate a prisoner from another prisoner who has just attacked him.  <u>Peate v. McCann</u>, 294 F.3d 879 (7th Cir. 2002).

Defendant emphasizes what she says was the nonserious nature of Hill's first act of self harm.  I agree with defendant that poking oneself with a thumbtack is far from the most efficacious way to attempt suicide.  Thus, if Hill had told defendant only that she had poked herself with a tack, summary judgment would be appropriate.  But that is not all that Hill told defendant.

Hill's description and characterization of her actions are key.  It is undisputed that Hill characterized her conduct as a suicide attempt.  Further, she was not just randomly poking away at her skin: she said she was trying to hit a vein and bleed to death.  Defendant adduced no evidence that she doubted Hill's characterization at the time or that she had any reason to do so.  Defendant's notes express no skepticism of Hill's statement.

21

In fact, defendant was aware of a host of other facts that would have reinforced the serious nature of Hill's behavior: a history of depression, previous statements to defendant and others that she wanted to die, a three week lapse in her antidepressive medication and a housing placement in segregation, where Hill could not be easily monitored by staff or other prisoners. (Defendant proposes as a fact that she did not know where Hill was housed, but that assertion is not supported by the record. In her deposition, defendant admitted after some hedging that she would have known whether plaintiff was housed in general population. Richards Dep., dkt. #22, at 59. Because the only housing classification in the jail other than general population is administrative confinement, it is reasonable to infer that defendant knew Hill was housed there). Defendant agrees that each of these factors contribute to a risk for suicide.

In addition, if one takes defendant at her word that she reviewed each prisoner's jail records before meeting with her, it is reasonable to infer also that defendant knew that Hill had been placed on suicide watch in the past and that she continued to report severe depression after her most recent arrest. With all of defendant's knowledge, a reasonable jury could find that defendant did not exercise professional judgment and that she was aware of a substantial risk that Hill would attempt to seriously harm herself.

The one factor pointing the other way is that Hill discussed future events with defendant, but even this provides defendant with little support. According to defendant's

22

notes, Hill's "future-oriented" comments were primarily in reference to problems she was experiencing: not wanting to live with her mother, not wanting to move away, not having any money.  In any event, defendant does not suggest that this factor would outweigh the others.  If defendant wishes to argue to the jury that she believed Hill was not suicidal because Hill discussed needing a prescription renewal, she is free to do so, but I cannot conclude that it entitles her to judgment as a matter of law.  (Defendant attempts to rely on events that occurred after her May 17 meeting with Hill.  Because defendant did not adduce any evidence that she was aware of anything that Hill said or did between the meeting and Hill's suicide, I cannot consider those proposed facts.  <u>Mombourquette</u>, 469 F. Supp. 2d at 641.)

2.  <u>Expert testimony</u>

Defendant's primary argument is that plaintiff cannot prevail without expert testimony that defendant was deliberately indifferent to Hill's health and safety.  This is a curious argument because it has no support in the jurisprudence of this circuit.   In determining whether the failure to prevent a suicide was a potential constitutional violation, the court of appeals has never held that expert testimony is dispositive or even particularly important.  <u>E.g.</u>, <u>Matos</u>, 335 F.3d at 557-58.  In fact, in <u>Leford v. Sullivan</u>, 105 F.3d 354 (7th Cir. 1997), the only case cited by the parties discussing the need for an expert on the

question of deliberate indifference, the court held explicitly that expert testimony was *not* required in the typical case because deliberate indifference is a subjective standard. This conclusion makes sense, especially in the context of this case.  Because I have concluded that even a lay person could find the risk to be obvious, it would make little sense to turn around and say that expert testimony was required.

The cases from other circuits cited by defendant, <u>Smith v. Jenkins</u>, 919 F.2d 90 (8th Cir. 1990), and <u>Greason v. Kemp</u>, 891 F.2d 829, 835 (11th Cir. 1990), do not suggest a different conclusion.  In these cases, the courts held only that summary judgment may be inappropriate when the parties' experts have conflicting opinions.  Those holdings simply have no relevance because neither side has advanced an expert opinion on the question of deliberate indifference.

Defendant makes two other arguments in support of her motion for summary judgment, both of them again related to plaintiff's expert, Michael Spierer: (1) Spierer testified at his deposition that he had not concluded that defendant was subjectively aware that Hill was a suicide risk; (2) he said that defendant could have concluded it was a "close call" whether to place Hill on suicide watch.

Defendant's first argument misunderstands the role of an expert.  Although Spierer may testify on the question whether a reasonable person in defendant's shoes would have recognized a risk (which he has done by testifying that defendant's conduct fell below the

24

standard of care), he may not testify about what defendant actually thought or believed.  To do so would be to offer an opinion on defendant's credibility, a determination that is reserved for the jury.  Goodwin v. MTD Products, Inc., 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues.  Rather, credibility questions are within the province of the trier of fact.")

Defendant's second argument appears to be that no reasonable jury could find in favor of plaintiff because Spierer testified at his deposition that someone with defendant's knowledge could have concluded that it was a "close call" after meeting with Hill whether to place Hill on suicide watch.  Defendant makes far too much of this statement.  Spierer used this phrase not as part of an opinion whether Hill was at a substantial risk of serious harm, but rather in the context of discussing what actions defendant should have taken after the meeting.  The question was whether defendant should have placed Hill on suicide watch immediately or could have taken less drastic measures.   Speier said only that *if* defendant had determined it was a "close call" whether to put Hill on suicide watch, defendant would have to consult further with colleagues about the proper course of action, giving them all the information she knew.  However, his opinion was clear that defendant knew enough to require her to act.  Spierer Dep., dkt #27, at 107-08.

In any event, to say it could have been a "close call" whether to place Hill on suicide watch is not to say that Hill was not at a substantial risk of serious harm or that defendant

25

was not aware of such a risk.  Particularly when the potential danger is death, a risk may be substantial even when there is some room for doubt.  In determining whether a risk is "substantial," courts must consider both the gravity of the potential harm and the likelihood that it will occur. Mombourquette, 469 F. Supp. 2d at 637 ("the more serious a possible injury, the lower the threshold for showing that the risk is substantial"); see also United States v. Boyd, 475 F.3d 875, 877-78 (7th Cir. 2007) ("Dangerousness is a function of the magnitude of the harm that will occur if the danger materializes and of the probability that it will materialize.")

Spierer's opinion simply recognizes that even within the realm of substantial risks, there are degrees of danger that may require different kinds of responses. Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005) ("vague complaint" about prisoner safety may trigger duty to investigate further).  For example, it would not be a reasonable response simply to confer with colleagues if the prisoner was found holding a razor to her wrist, but it might be reasonable if the danger was less immediate or less clear.  In this case, the undisputed facts show that defendant knew enough to permit a reasonable jury to find that Hill was at a substantial risk of seriously harming herself.

B.  Reasonable Response

Defendant devotes little space in her brief to an argument that, if she did know of a

26

risk of serious harm, she took reasonable measures to abate it.  It is undisputed that after Hill told defendant that she had tried to commit suicide, defendant did not place her on suicide watch, did not try to have her moved to a less isolated setting, did not ask to have her monitored more closely and never met with her again.  However, defendant points to two actions that she says she did take: (1) asking Hill whether she was suicidal and extracting a "no harm" promise from her; (2) speaking to her supervisor, Barbara Andrew, about her conversation with Hill.

By itself, extracting a "no harm" promise would not necessarily make defendant's response reasonable as a matter of law.  Mombourquette, 469 F.3d at 643-44.  Defendant adduces no evidence that this is an effective technique in preventing a suicide or even that believes it is.  When defendant's supervisor was asked what "good" extracting a "no harm" promise accomplished, she said "not much."  Andrew Dep., dkt. #29, at 30.

In any event, there is a genuine dispute whether Hill told defendant that she was not going to harm herself.  Defendant did not document that promise in her notes, even though she believes it is important to do so and had included this in her notes in the past. Defendant testified that she did not include the no harm promise in her notes because she was busy, but that explanation is unconvincing.  Defendant's notes of her interaction with Hill on May 17 are fairly extensive and include many details that are less important than the question whether Hill was suicidal.

27

With respect to defendant's report to Andrew, this was a step in the right direction, but I cannot conclude that it was adequate as a matter of law. An official's constitutional obligations are not satisfied simply by taking *some* action, she must take reasonable steps under the circumstances to abate the risk. Borello v. Allison, 446 F.3d 742, 749 (7th Cir. 2006). Unfortunately, defendant's report was nearly worthless because she left out the most important information. Defendant told Andrew that plaintiff scratched herself with a tack, but for reasons unexplained she omitted any reference to Hill's statement that she had been trying to kill herself by using the tack to hit a vein.

Defendant cannot withhold the most alarming information and then avoid liability by passing the buck to her supervisor. This would be akin to a prison guard avoiding liability for an assault by telling the warden that two prisoners were not getting along but omitting the fact that one prisoner had threatened to kill the other. Certainly, it would not have been difficult for defendant to provide a more complete account. Cavalieri, 321 F.3d at 622 (in denying motion for summary judgment in failure to prevent suicide case, noting easy steps defendant could have taken to abate risk, such as communicating information to other jail officials). Viewing the facts in the light most favorable to plaintiff, defendant's response was little better than ignoring Hill altogether. Accordingly, I must conclude that defendant's motion for summary judgment must be denied with respect to plaintiff's constitutional claim.

Defendant includes a separate section in her brief in which she argues that punitive damages are unavailable as a matter of law. Because defendant's arguments in this section mirror those with respect to liability, I need not discuss them further.


ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendant Marie Richards is DENIED with respect to plaintiff Estate of Tierra Hill's constitutional claim against Richards in her individual capacity. Defendant Richards's motion is GRANTED with respect to plaintiff's official capacity claim.

2. The court declines to exercise supplemental jurisdiction over plaintiff's state law negligence claim against defendants Richards and Mental Health Center of Dane County. The complaint is DISMISSED as to those claims. Because plaintiff has no other claim against defendant Mental Health Center, the complaint is DISMISSED as to that defendant.

3. The complaint is DISMISSED as to plaintiff Minnie Marie Hill's claim.

4. Defendant Mental Health Center's motion to strike the supplemental affidavit of

29

Michael Spierer is DENIED as moot.

Entered this 6th day of December, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge